IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| DRAMETTA TODD, individually and on behalf of a class, | ) ) ) |
| Plaintiffs, | ) 10 C 5598 ) ) Judge Chang |
| v. | ) ) |
| TARGET CORPORATION, | ) ) |
| Defendant. | ) |

**PLAINTIFF DRAMETTA TODD'S RESPONSE TO DEFENDANT
TARGET CORPORATION'S MOTION FOR SUMMARY JUDGMENT**

**INTRODUCTION**

Plaintiff Drametta Todd ("Ms. Todd" or "Plaintiff") twice was provided from Defendant Target Corporation's ("Target" or "Defendant") credit card receipts at check-out which disclosed the expiration date of her credit card. (Def. SMF ¶¶ 11, 13, Ex. E, F, H). She contends that Target's practice violates the Fair and Accurate Credit Transactions Act of 2003 ("FACTA"), codified in pertinent part at 15 U.S.C. § 1681c(g)(1) of the Fair Credit Reporting Act ("FCRA"). Target estimates that for a time period from January 2010 to August 2010, approximately 2 million of these sales audit copy receipts were retained by cardholders who left a Target store with them. (Pl. SMF ¶ 9-11).

Target has filed a motion for summary judgment claiming that the disclosure of the expiration date on the sales audit copies does not violate FACTA because the sales audit copy is a "merchant copy" not "provided to the cardholder", (Def. Memo. p. 4), even though a sales audit copy was provided to Target customers who left the store with approximately 2 million of them over an eight month time period. (Pl. SMF ¶ 9-11). To support its position, Target relies upon several district court opinions holding that printing credit card expiration dates on a merchant receipt does not violate FACTA. None

1

of those cases involved a defendant allowing merchant copies to be given to cardholders millions of times. None of these cases looked to the FTC's May 2007 guidance on section 1681c(g)(1) as required under *Safeco Ins. Co. of America v. Burr*, 551 U.S. 47, 57, 127 S. Ct. 2201, 167 L. Ed. 2d 1045 (2007) and *Shlahtichman v. 1-800-Contacts, Inc.,* 615 F.3d 794, 803 (7th Cir. 2010).

Furthermore, Target does not argue that it relied on any of these district court decisions as a safe harbor, but instead argues that it relied on regulations from card issuers such as American Express, Master Card and Visa. (Def. Memo pp. 9-12). Discovery has however shown that none of these companies required Target to print an expiration date on the sales audit copy, and all in fact instruct merchants to not print the expiration date on merchant copies, charge documents retained by the merchant. (Plt. SMF ¶¶ 27, 29-30).

Target also contends that its practice was not "objectively unreasonable" because its practice has a "foundation is in the statutory text" and it does not "flaunt guidance from the courts of appeals or the FTC". (Def. Memo p. 13). As discussed below, Target's position is without merit and its motion for summary judgment must be denied.

## LEGAL STANDARD

Summary judgment is proper only, "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A non-moving party is entitled to have all facts, and any inference drawn from those facts, to be viewed in the light most favorable to them. *Wis. Cent Ltd. v. Shannon*, 539 F.3d 751, 756 (7th Cir. 2008). The moving party has the burden of establishing the lack of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). In deciding a motion for summary judgment, the court should not assess the weigh of the evidence or the credibility of the witnesses. *Abdullahi v. City of Madison*, 423 F.3d 763, 773 (7th Cir. 2005). Summary judgment should not be granted if, "the

evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

## MATERIAL FACTS

In every transaction at Target's point of sales terminals ("POS") in which a cardholder used a debit or credit card, Target electronically stores information related to the cardholder's purchase, including the items purchased, the cardholder's name, account number, and the cards expiration date. (Pl. SMF. ¶ 1). In such POS transactions, the cardholder's signature will also be electronically stored except when Target's electronic signature pad ("PIN pad") fails to pick up a customer's signature, recognizes the POS is off line, the customer fails to sign the PIN pad or the customer requests one from the cashier, thereby causing a sales audit copy to be generated. (Pl. SMF ¶ 2); (Def. SMF ¶ 16).

When a sales audit copy is generated in conjunction and attached to the point of sales receipt that itemizes the merchandise, the sales audit copy will display the cardholder's expiration date, while the point of sales receipt does not have a field for the expiration date, but does show a truncated version of the card's account number. (Def. SMF, Ex. D-H); (Pl. SMF ¶ 4).

Target itself categorizes a sales audit copy as a form of a receipt. (Pl. SMF ¶ 20). MasterCard's regulations since 2008 refer to the "cardholder" and "merchant" copy as both being "receipts". (Pl. SMF ¶ 21). Target at all times knowingly printed a card's expiration date on the sales audit copy until it discontinued its practice on November 13, 2010. (Pl. SMF. ¶¶ 6-7); (Def. SMF ¶ 22); (Def. SMF, Ex. I, Resp. Int. No. 7)

Based on two samples conducted on behalf of Target and other statistical data, Target estimates that for a time period from January 2010 to August 2010, approximately 1,961,007 to 2,307,770, give or take a 30% margin of error, sales audit copies were retained by cardholders who left a Target Store with the sales audit copy. (Pl. SMF ¶¶ 9-11).

Target argues that the receipt states that it should be retained by Target. (Def. SMF ¶ 16). However, Target's training manual did not inform cashiers about how to handle the sales audit copies (Pl. SMF ¶ 12). Nothing in Target's the training manuals instructed the cashier to look at the bottom of the sales audit copy. (Pl. SMF ¶ 13). Only if a cashier read the bottom of the sales audit copy would they know what to do with it. (Pl. SMF ¶ 14). Nor has any Target employee been disciplined for failing to secure a Sales Audit Copy from a customer. (Pl. SMF ¶ 15). No one seems to keep track of the sales audit copies. Target simply maintains all of the sales audit copies in boxes for a period of 13 months at a Minneapolis warehouse. (Pl. SMF ¶ 16 ).

Target asserts that the sales audit receipt states on its face "PLACE IN MEDIA LOCATION UNDER REGISTER. GSTL->BIND & PLACE IN MEDIA BRICK AT CLOSE." (Def. SMF ¶ 16). The sales audit copy has forward facing statements that are intended for the customer to read, including the word "Receipt ID" and it has the highest priced item purchased printed on it. (Pl. SMF ¶ 17); (Def. SMF, Ex. E, F, H). A "Receipt ID" is a number that identifies a particular transaction between Target and its customer. (Pl. SMF ¶ 19).

Target asserts that a sales audit copy is not a receipt because it cannot be used to return merchandise. (Def. SMF ¶ 17). However, Target's return policy does not require a receipt present to return merchandise. (Pl. SMF ¶ 18).

MasterCard instructed merchants that after October 1, 2008, any new point of sales terminals deployed were prohibited from printing the expiration date on the merchant copy. (Pl. SMF ¶ 27). Target opened up at a minimum 53 new stores after October 1, 2008, and printed card's expiration date on all of those stores' sales audit copies until November 13, 2010. (Pl. SMF. ¶ 28); (Def. SMF. ¶ 9). Additionally in the spring of 2010, Target completed a software update on its POS terminals but did not suppress the printing of the expiration date on the sales audit copy. (Pl. SMF ¶ 35).

American Express and Visa instructed merchants not to print expiration dates on merchant copies, charge documents retained by the merchant. (Pl. SMF. ¶¶ 29-30). At no time did MasterCard, American Express or Visa mandate that Target print an expiration date on sales audit copies, or a merchant copy. (Pl. SMF. ¶ 33). American Express only requires Target to generate an electronic record for charge back purposes that contains the card's expiration date. (Pl. SMF ¶ 31).

Target did not need to print the expiration date on the sales audit copy as that information was stored electronically in Target's database. (Pl. SMF ¶ 1). The function of the sales audit copy is to capture a customer's signature because the PIN pad was not able to do it electronically. (Pl. SMF ¶ 4). A sales audit copy is used by Target to confirm that a purchase was made by the cardholder for chargeback purposes. (Pl. SMF ¶ 34).

Target did not rely on any advice of counsel in deciding to continue to print expiration dates on sales audit copies after the enactment of FACTA and the 2008 Clarification Act. (Pl. SMF ¶ 26). Likewise, card issuers do not provide Target legal advice on the topic. (*See e.g.* Pl. SMF ¶ 32).

## ARGUMENT

**I.  TARGET'S SALES AUDIT COPY IS A "RECEIPT PROVIDED TO" THE CARDHOLDER**

The Fair and Accurate Credit Transactions Act of 2003 ("FACTA"), 15 U.S.C. § 1681c(g), provides:

> Except as otherwise provided in this subsection, no person that accepts credit cards or debit cards for the transaction of business shall print more than the last 5 digits or the care number or the expiration date upon any receipt provided to the cardholder at the point of sale or transaction.

Target argues that its sales audit copies were not "provided to the cardholder" because they were "merchant copies" intended to be kept by Target. (Def. Memo. p. 4). Therefore, it is Target's position that if you give a receipt at a point of sale and call it something other than

5

"receipt", you can disclose cardholder information on a piece of paper that more than likely will wind up in the trash. FCRA § 1681c(g)(1) is unambiguous and cannot reasonably be read in the manner Target suggests.

"Absent a definition supplied by the statute itself, we look to the ordinary or natural meaning of the term." *Shlahtichman v. 1-800-Contacts, Inc.,* 615 F.3d 794, 798 (7th Cir. 2010) (citations omitted). In determining statutory construction a court, "is to determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case." *Robinson v. Shell Oil Co.*, 519 U.S. 337, 340 (1997) (*quoting United States v. Ron Pair Enterprises, Inc.*, 489 U.S. 235, 240 (1989)). The inquiry ceases, "if the statutory language is unambiguous and 'the statutory scheme is coherent and consistent.'" *Id.*

Section 1681c(g)(1) is applicable to "any receipt." Under the rules of statutory construction, "'any' means 'any[.]'" *Manning v. United States*, 546 F.3d 430, 436 (7th Cir. 2008). Congress specifically used the word "any" because around the time of FACTA's enactment, merchants, including Target, were printing duplicate receipts, one white and one yellow (customer copy and merchant copy), each displaying the exact information regarding the cardholder's purchase and credit or debit card's information, and expiration dates. (Pl. SMF ¶¶ 22-24).

Target requests this Court interpret the statute to delete the word "any" and add the word "intended" into 15 U.S.C. § 1681c(g)(1), thereby changing the provision to, "[the] receipt *intended* [to be] provided to the cardholder at the point of sale or transaction." Target is asking this Court to import additional language into the FCRA that Congress did not provide. This is improper *See Edwards v. Niagara Credit Solutions, Inc.*, 586 F. Supp. 2d 1346, 1352 (N.D. Ga.

6

2008) *aff'd* 584 F.3d 1350 (11th Cir. 2009); *see Phinn v. Capital One Auto Fin., Inc.*, 502 F. Supp. 2d 625, 628 (E.D. Mich. 2007).

A receipt is defined as a "[w]ritten acknowledgement of receipt of money or delivery of anything of value, without containing any affirmative obligation upon either party to it; a mere admission of fact * * * A writing which acknowledges taking or receiving either money or goods which have been paid or have been delivered." BLACK'S LAW DICTIONARY, p. 1268 (6th Ed. 1998); Compact Oxford English Dictionary ("a written or printed statement acknowledging that something has been paid for or that goods have been received"); Merriam-Webster's Online Dictionary, 11th Edition ("a writing acknowledging the receiving of goods or money"); Webster's New World College Dictionary, 4th Ed ("a written acknowledgment that something, as goods, money, etc., has been received"); Cambridge Dictionary Online ("A piece of paper which proves that money, goods or information has been received.").

Target itself categorized a sales audit copy as a receipt. (Pl. SMF. ¶ 20). Target also admits that the function of the sales audit copy is to confirm that a customer made a purchase for chargeback purposes, (Def. SMF ¶ 18; Memo. p. 4), and therefore by definition it is a "receipt." MasterCard's regulations since 2008 refer to the "merchant" copy as a "receipt." (Pl. SMF ¶ 21).

Target argues that the sales audit copy is "not the actual 'receipt provided to the cardholder at the point of sale or transaction'." (Def. Memo. p. 4). Target argues that the sales audit copy is "maintained in case of a retrieval request from the card issuer and that it does not "itemize merchandise and cannot be used by the cardholder to return merchandise." *Id*. These limitations do not appear in the statute. The Seventh Circuit in examining the FCRA § 1681c(g)(1) noted that, "The statutory language strikes us as significant not only for the terms that it uses but for those it does not." *Shlahtichman*, 615 F.3d at 801. FCRA § 1681c(g)(1) does

7

not distinguish customer receipts from merchant copy receipts; it provides that it applies to "any receipt" that is in fact "provided to the cardholder" 15 U.S.C. § 1681c(g)(1). Likewise, FCRA § 1681c(g)(2) contains specific exclusions to the general rule of FCRA § 1681c(g)(1). Surely, Congress could have excluded merchant copy receipts if it wanted to.

Most importantly, Target's argument that a sales audit copy is not "provided to the cardholder" is flatly wrong in light of the evidence. Cardholder's transactions with Target over an 8-month period resulted in millions of sales audit copies leaving a Target store after they were provided to the cardholder by Target's cashiers. (Pl. SMF ¶¶ 9-11).

The American Heritage Dictionary defines the word "provide" as a verb meaning, "To furnish; supply" and "To make available". The American Heritage Dictionary, p. 676 (2004 4th ed.). As early as the Constitution, the legislature used the word "provide" in the context of "to make available." U.S. Const. Art I § 8  Here, Target's own two samples show that 16.4-19.3% of Target's customers walk out of the store with a sales audit copy. (Pl. SMF ¶¶ 10-11).

In addition, case law support's Plaintiff's position. "The language 'receipt provided to the cardholder at the point of the sale or transaction,' brings to mind the *passing of a paper receipt between buyer and seller at a store location.*" *Holt v. LivInn Suites, Inc.*, Civ. No. 10-383 (RHK/RLE), 2010 U.S. Dist. LEXIS 141792 * 9-10 (D. Minn. May 21, 2010) (emphasis added). Another federal court has stated, "FACTA has created a legally protected interest in *being handed a receipt* that omits certain of plaintiff's credit card information." *Hammer v. JP's Southwestern Foods, L.L.C.*, 739 F. Supp. 2d 1155, 1162 (W.D. Mo. 2010) (emphasis added). Even one case cited by Target noted, "for a receipt to be 'provided to the cardholder,' the cardholder must be furnished or supplied with it." *Turner v. Ben & Gabby's,* Inc, 08-61033-

8

CIV-UNGARO, p. 3 (S.D. Fla. Aug. 8, 2008) (unpublished, not available electronically) (Def. SMF Ex. C).

Target's cases are inapposite. Target's argument begins with the magistrate judge's footnote in *dicta* in *Ehrheart v. Bose Corp.*, 2007 U.S. Dist. LEXIS 95772 * 10 n. 5 (W.D. Pa. Dec. 10, 2007). Whether a merchant copy could trigger liability was not even in issue in *Bose* as the defendant moved for and was denied summary judgment on issue of what was mean by the phrase "point of sale" under FACTA. *Ehrheart v. Bose Corp.*, 2008 U.S. Dist. LEXIS 752 * 2 (W.D. Pa. Jan. 4, 2008). The statement that "merchant's copies of receipts" are excluded cannot reasonably be read under the *Safeco* standard to mean receipts labeled as merchant's copy, but receipts which are in fact kept by merchants. 15 U.S.C. § 1681c(g)(1); (Def. SMF ¶ 9).

*Turner v. Ben & Gabby's*, case No. 0:08-cv-61033-UU (S.D.Fla. Aug. 26, 2008), addressed the question of whether a merchant copy "presented to" the cardholder for signature but not supplied for retention is "provided to" the cardholder. *Turner v. Matador Argentinean Steakhouse, Corp.*, 2008 WL 4935445 (S.D. Fla. Nov. 18, 2008) is similar. There the court noted that the "'merchant copy' is handed back to the cashier immediately after it is signed by the customer" *Id.* At *2. In both *Turner* cases there was no evidence that the defendants provided millions of receipts to cardholder as is the case here. Additionally, those defendants did not label the document as a "Receipt" and categorically considered it a receipt.

*Zahn v. J.S.H. Inc. of Faribault*, 2010 WL 3862860, *1 (D. Minn. Sept. 28, 2010) rejected the FACTA claim holding that a "Long John Silver's employee mistakenly hand[ing] the merchant copy" to the plaintiff "did not rise to the level of a willful violation." *Vinton v. First Data Merchant Services*, 2011 WL 776135 (W.D. Mich. Mar.11, 2011) is a similar fact

pattern. This case does not involve an accidental error, but the provisions of millions of non-compliant receipts because cashiers and other personnel were not trained to do otherwise.

In *Keller v Macon County Greyhound Park*, 2011 U.S. Dist. LEXIS 31777, (M.D. Ala. Mar. 24, 2011), the court certified a class of 2,277 claimants who receive receipts which violated FACTA. The mention of the merchant's copy was in connection with commonality and the question of whether class members could be identified off the merchant's copies of the transactions retained by the defendant. *Id.* at * 13, 15.

## II. TARGET'S POSITION IS NOT "OBJECTIVELY REASONABLE" UNDER *SAFECO*

Target argues that it did not willfully violate the Fair Credit Reporting Act because its view of the Act's requirements is "objectively reasonable", relying on *Safeco Ins. Co. of America v. Burr*, 551 U.S. 47, 57, 127 S. Ct. 2201, 167 L. Ed. 2d 1045 (2007). As Target notes,

> A business's view may be "objectively reasonable" if the "reading has a foundation in the statutory text" and does not flout "guidance from the courts of appeals or the Federal Trade Commission (FTC) that might have warned [the business} away from the view it took." But where such guidance is lacking– that is where " there has been no contrary opinion from a court of appeals or federal agency suggesting that the company's understanding of the statute is wrong" – then a business is taking an "objectively reasonable" approach to complying with the Act's requirements is not willfully violating the Act.

Target's handling of sales audit copies was not "objectively reasonable."

As discussed above, Target's claim that putting the words "merchant copy" or "sales audit copy" on a receipt exculpates them if it is regularly handed to the customer is absurd. It does not have a foundation in the statutory text. Even MasterCard's regulations as early as 2008, viewed them both a "receipts." (Pl. SMF ¶ 21).

Furthermore, the May 2007 FTC Business alert, relied upon by Target, supports plaintiff. It states the FCRA "*applies only to receipts you give your customers at the point of sale, not to*

*any <u>transaction record</u> <u>you retain</u>.*" (Def. SMF ¶ 9). This lawsuit concerns the millions of sales audit copies that Target provided to cardholders, not the copies it retained. (Pl. SMF. ¶¶ 9-11).

Finally, as discussed above, Target's practices are not excused by the 6 inapposite federal district court opinions it cites. Target in discovery has not identified that anyone at Target knew about the cases it cited prior to the filing of this lawsuit or that it was in possession of any documents that referred to these cases. (*See e.g.* Doc. 41-1; Plt. SMF. ¶ 26). Further, the district courts did not analyze the FTC's May 2007 guidance as required *Safeco* in reaching their decisions.

"'[W]illfully'" is a "'word of many meanings'" dependent on context, "we have generally taken it [when used as a statutory condition of civil liability] to cover not only knowing violations of a standard, but reckless ones as well." *Safeco*, 551 U.S. at 57 (*quoting Bryan v. United States*, 524 U.S. 184, 191, 118 S. Ct. 1939, 141 L. Ed. 2d 197 (1998)). The Ninth Circuit's opinion on what willful in the context of the FCRA was upheld by the Supreme Court in *Safeco*:

> A company will not have acted in reckless disregard of . . . consumers' rights if it has diligently and in good faith attempted to fulfill its statutory obligations and to determine the correct legal meaning of the statute and had thereby come to a tenable, albeit erroneous, interpretation of the statute. In contrast, neither a deliberate failure to determine the extent of its obligations nor reliance on creative lawyering that provides indefensible answers will ordinarily be sufficient to avoid a conclusion that a company acted with willful disregard of FCRA's requirement.

*Reynolds v. Hartford Fin. Servs. Group, Inc.*, 435 F.3d 1081, 1099 (9th Cir. 2006).

A finding of recklessness is a finding of willfulness and under the FCRA is, "something more than negligence but less than knowledge of the law's requirements." *Murray v. New Cingular Wireless Servs., Inc.*, 523 F.3d 719, 726 (7th Cir. 2008); *Kubas v. Standard Parking Corp.*, 594 F. Supp. 2d 1029, 2009 WL 211967, * 2 (N.D. Ill. Jan. 29, 2009). A defendant will

have willfully violated the FCRA if there exists a "contrary opinion from a court of appeals or federal agency suggesting that the company's understanding of the statute is wrong." *Shlahtichman*, 615 F.3d at 803. The FTC's May 2007 guidance, (Def. SMF ¶ 9), "might have warned [Target] away from the view it took" and as such Target's lawsuit reading of FCRA § 1681c(g)(1) is objectively unreasonable. *Safeco*, 551 U.S. at 69-70.

Target's providing a sales audit copies to cardholders at the POS is not an isolated instance. Based on two samples conducted on behalf of Target and other statistical data, Target estimates that for a time period from January 2010 to August 2010, approximately 1,961,007 to 2,307,770, give or take a 30% margin of error, sales audit copies were retained by cardholders who left a Target Store with that sales audit copy. (Pl. SMF ¶ 9-11). Furthermore, Target had knowledge that all of the sales audit copies were not being retained by Target. *See* (Pl. SMF ¶ 7)

Target argues that the receipt states that it should be retained by Target. However, Target's training manual did not inform cashiers about how to handle the sales audit copies, nor has any Target employee been disciplined for failing to secure a Sales Audit Copy from a customer. (Pl. SMF ¶¶ 12-13,15). Indeed, only if a cashier read the bottom of the sales audit copy would they potentially know what to do with it. (Pl. SMF ¶ 14). Further, the receipt also contains language meant for the customer to read, has the highest item of the purchase listed, and has to word "Receipt ID" on it, all looking as if they are intended for the cardholder to keep. (Pl. SMF ¶¶ 17-18).

Target does not argue that it conducted any pre-suit investigation to determine what a consumer's rights were under 15 U.S.C. § 1681c(g)(1) as to the sales audit copy. Indeed, it has not provided any documents that such an investigation occurred. (Pl. SMF. ¶ 26). It did not rely

on any advise of counsel. (Pl. SMF ¶ 26). Likewise, Target's memorandum does not argue that it was aware of the district court cases it cited in its brief issued before this lawsuit or that it relied on them in any way.

Target argues that it was required to print the expiration date on the sales audit copy. (Def. SMF ¶ 18). The card issuers' regulations and rules are however were silent on the issue. (Pl. SMF ¶ 33), but MasterCard since 2008, referred to a "merchant" copy as a "receipt" which should have alerted Target to the possibility that a "merchant" copy could trigger liability under FACTA. (Pl. SMF ¶ 21). Indeed, after MasterCard expressly prohibited Target from printing expiration dates on merchant copies after October 1, 2008, Target opened up 53 new stores and those just placed into service POS terminals continued to print out sales audit copies with expiration dates. (Pl. SMF ¶¶ 27-28). Visa in July 2010 and American Express in October 2010, likewise expressly directed merchants to stop printing expiration dates on merchant copies, and never before mandated that Target must print an expiration date on the sales audit copy. (Pl. SMF ¶¶ 29-30). However, Target kept printing expiration dates on sales audit copies until November 13, 2011. (Def. SMF ¶ 22).

Target argues that it cannot be found to act unreasonably in light of conflicting card issuer requirements. (Def. Memo p. 12). MasterCard's rules did wrongly state for POS terminals already in service "cardholder" receipts could continue to print the expiration date until December 31, 2011, so long as the account number was truncated. (Pl. SMF ¶ 36). This however should have caused Target to make further inquiry of MasterCard's statement, as it is clearly contrary to the FACTA's amendments and the 2008 Clarification Act. Not to obtain advice of counsel in light of such an erroneous statement was reckless; if Target even read the

13

2008 regulations at all which it has been asked to produce in discovery but did not do so. *See* (Pl. SMF ¶ 26). Plaintiff further denies that Target relied on the MasterCard regulations at all. (Pl. Answer to Def. SMF ¶ 23).

Target's reading of 15 U.S.C. § 1681c(g)(1) is not "objectively reasonable" as there is no foundation in the statutory text of 15 U.S.C. § 1681c(g)(1) to support its suggested reading as noted above. Target itself categorized a sales audit copy as a receipt and MasterCard since 2008 referred to a "merchant" copy as a "receipt." (Pl. SMF ¶¶ 20-21). Therefore, Target should have known that liability would be trigger under FACTA if the sales audit copy was provided to the cardholder under the FTC's May 2007 guidance. Target's statutory interpretation arguments that putting the words "merchant copy" or "sales audit copy" on a receipt exculpates them liability because it is never "intended" to be kept by the cardholder, even those the receipt was regularly handed to and carried out of the store by millions of cardholders, is absurd as its proposed reading flouts the guidance of the FTC that clearly states that liability "applies only to the receipts your give your customers at the point of sale". (*See* Def. SMF ¶ 9).

Target further knows that its "transaction record" is its electronic database. (*See* Pl. SMF ¶¶ 1, 37-38). American Express' contract with Target demonstrates that there is a difference between "receipts" printed at the point of sales and the transaction record that it is required to keep electronically for charge back purposes. (Pl. SMF ¶¶ 31, 37-38). The fact that Target complied with FACTA by truncating credit card numbers as to its point of sale receipt does not excuse its failure to comply with FACTA as to Sales Audit Receipts. Indeed, it shows that Target was aware of FACTA and its requirements and yet failed to comply.

*Safeco* and *Shlahtichman* clearly mandate that plain language of 15 U.S.C. § 1681c(g)(1) must be followed and the FTC's guidance in absence of a Court of Appeals ruling is the ultimate authority on the meaning of the section of the FCRA. *Safeco*, 551 U.S. at 69-70. Given that Target has an electronic transaction record, it categorized a sales audit copy as a receipt, and that since 2008 MasterCard's regulations have referred to a "merchant" copy as a "receipt", the FTC's guidance clearly placed Target on notice that FACTA prohibited providing sales audit copies with an expiration date to millions of cardholders. Likewise, Target did not even follow the regulations set forth by the card issuing companies to which it argues it relied upon. Finally, permitting within an eight-month time span approximately 2 million of sales audit copies that contained the card's expiration date to leave a Target store with the cardholder raises a genuine issue of fact whether such conduct arises to the level of recklessness.

## CONCLUSION

WHEREFORE the reasons above, this Honorable Court should deny Target's motion as material issues of genuine fact exist and therefore as a matter of law, Target is not entitled to summary judgment.

                                                Respectfully submitted,

                                                <u>s/ Curtis C. Warner</u>
                                                   Curtis C. Warner

Curtis C. Warner
Warner Law Firm, LLC
Millennium Park Plaza
155 N. Michigan Ave. 560
Chicago, Illinois 60601
(312) 238-9820 (TEL)
cwarner@warnerlawllc.com

Daniel A. Edelman
Cathleen M. Combs

James O. Latturner
Francis R. Greene
EDELMAN, COMBS, LATTURNER
    &amp; GOODWIN, LLC
120 S. LaSalle Street, 18th Floor
Chicago, Illinois 60603
(312) 739-4200
(312) 419-0379 (FAX)

## CERTIFICATE OF SERVICE

I, Curtis C. Warner, hereby certify that on **August 2, 2011**, I filed electronically **Plaintiff's Response in Opposition to Target's Motion for Summary Judgment and Plaintiff's Response to Defendant's Statement of Material Facts / Plaintiff's Additional Statement of Material Facts and attached Appendices A-V** using the Court's CM/ECF system, which automatically will send notice to those parties who have appeared and are so registered:

        Respectfully submitted,

        s/ Curtis C. Warner
          Curtis C. Warner

Curtis C. Warner
Warner Law Firm, LLC
155 N. Michigan Avenue, Suite 560
Chicago, Illinois 60601
(312) 238-9820 (TEL)